UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                             :

UNITED STATES OF AMERICA        :

                 -v.-                       :
                                            :      S3 11 Cr. 32 (JSR)

MANOSHA KARUNATILAKA,        :

            Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

                                                                   PREET BHARARA
                                                                   United States Attorney
                                                                   Southern District of New York
                                                                   Attorney for the United States
                                                                       of America

ANTONIA APPS
DAVID S. LEIBOWITZ
Assistant United States Attorney

    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                :

UNITED STATES OF AMERICA       :

                     -v.-                      :
                                                :         S3 11 Cr. 32 (JSR)

MANOSHA KARUNATILAKA,       :

               Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this brief memorandum for the Court's consideration in connection with the sentencing of the defendant MANOSHA KARUNATILAKA. The Government respectfully submits that a sentence within the stipulated guidelines range of 37 to 46 months is appropriate and "sufficient, but not greater than necessary, to comply with the purposes" of sentencing under 18 U.S.C. § 3553(a)(2).

### FACTUAL BACKGROUND

From approximately January 2007 until his arrest in December 2010, Karunatilaka worked for Taiwan Semiconductor Manufacturing Company, Ltd. ("TSMC"), a technology company with global headquarters in Hsinchu, Taiwan, and listed on the NYSE (ticker symbol: TSM) in New York, New York. On or about January 2, 2007, Karunatilaka executed an employment agreement with TSMC that restricted the disclosure of confidential information and prohibited any outside employment. Additionally, TSMC's compliance policies prohibited the unauthorized disclosure of TSMC's confidential information.

Beginning in or about September 2008 through to in or about late 2010, Karunatilaka was also a "consultant" for the expert-networking firm Primary Global Research ("PGR"). PGR

connected public company insiders, like Karunatilaka, with money managers, such as hedge funds and other investment firms, for a fee. Thus, the money managers – PGR's clients – would pay PGR money to be able to talk to PGR's network of "consultants" or "experts"; and PGR would in turn locate experts and then pay them a fee for talking to the PGR clients. At times, experts like Karunatilaka would also talk to employees of PGR. Karunatilaka was paid an hourly fee of approximately $200 for his consultation calls with PGR clients. In total, Karunatilaka participated in approximately 200 calls with PGR clients and employees, earning approximately $35,000 for his consultation services.

      The information that Karunatilaka provided to PGR clients and employees was material, non-public information. TSMC was in the business of producing silicon "wafers." A "wafer" is a thin, round slice of semiconductor material from which microchips are made. Silicon is processed into large cylindrical ingots, sliced into ultra-thin wafers and then implanted with transistors before being cut into smaller semiconductor chips. Karunatilaka would provide "bookings" or "order " numbers for TSMC's wafer shipments to TSMC's North American customers; both the actual numbers and TSMC's customers' forecasted numbers. That is, Karunatilaka would indicate how many wafers were booked/ordered by TSMC's North American customers. When Karunatilaka provided this wafer bookings/order data, the information was not public. Further, at the time of Karunatilaka's consultation calls with PGR clients, wafer shipments to TSMC's North American customers represented approximately between 60 and 70 percent of TSMC's overall wafer output, and therefore was a good indicator of TSMC's overall revenue. Additionally, "wafer starts" gave a good indicator about the actual and projected business by TSMC's customers (wafer starts are, in effect, a good proxy of actual

and expected sales at TSMC's customers, which are technology companies that incorporate wafers into their products).

One of the PGR clients that Karunatilaka spoke to was an analyst ("Analyst-1") at a hedge fund located in New York, New York ("Hedge Fund-A"). According to PGR's records, Karunatilaka spoke to this analyst frequently beginning in late 2008 through approximately May, 2010. According to Analyst-1, Analyst-1 recommended a short trade based on Karunatilaka's information in May 2009. Hedge Fund-A acted on that recommendation, accumulating a net short position of approximately 1.74 million shares of TSMC between May 11, 2009 and May 21, 2009. Hedge Fund-A then covered that short position in its entirety between June 15, 2009 and June 17, 2009. Hedge Fund-A made a profit of approximately $1,715,972 from this trade.

When Karunatilaka was interviewed by an FBI agent in or about July 2010 about his activities with PGR, Karunatilaka stated, among other things, that he knew when he was talking to PGR clients and that they were using the data Karunatilaka provided to make trades and investment decisions about TSMC and TSMC's customers. He also stated that he had been advised by TSMC that he was not allowed to provide information about TSMC to anyone outside of TSMC. However, Karunatilaka had been providing information about TSMC and TSMC's customers to both PGR employees and PGR clients. Karunatilaka stated that he knew what he was doing was wrong, and that it was wrong to provide information regarding TSMC and TSMC's customers to PGR employees and PGR clients.

From the time he was arrested, Karunatilaka through counsel indicated to the Government a willingness to accept responsibility for his conduct in this case. The defendant pled guilty to the above-captioned Information before the Government produced any discovery

to him.

## Consideration of the 3553(a) Factors

In determining a reasonable sentence, the sentencing judge is required to consider the factors set forth at 18 U.S.C. § 3553(a). These factors include, among others, (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (3) the need for afford adequate deterrence to criminal conduct; and (4) the need to avoid unwarranted sentence disparity. *See* 18 U.S.C. § 3553(a).

Karunatilaka's criminal conduct warrants a sentence within the stipulated Guidelines range of 37 to 46 months' imprisonment. At the time he committed these crimes, Karunatilaka was an insider at an important technology company and trusted with valuable confidential information as part of his job. He conspired with at least one PGR employee and multiple PGR clients during the course of his consultation relationship with PGR. For tens of thousands of dollars, he cheated the system and provided sophisticated stock traders with an unfair advantage over the average investor. In so doing, Karunatilaka and his co-conspirators knowingly, willfully, and repeatedly broke the law.

Insider trading constitutes a violation of the Securities and Exchange Act of 1934. A fundamental purpose of that statute is to ensure fair dealing and outlaw deceptive and inequitable practices in the securities markets. Congress recognized that any deceptive or manipulative practice that influenced or related to trading activity undermined the function and purpose of a free market. Insider trading causes that harm – namely by undermining the public's confidence in the capital markets, and by suggesting to ordinary investors that they should not invest

because those markets are rigged in favor of well-connected Wall Street professionals. The integrity of the markets is critical to the functioning of the nation's economy, which depends upon well-functioning markets for liquidity and access to capital. Not only did his crimes harm the integrity of the markets, they harmed public companies whose business secrets Karunatilaka and his hedge fund co-conspirators were stealing for their own benefit. When corporate insiders like Karunatilaka repeatedly and brazenly flout the law, they must be punished accordingly.

A stiff sentence is warranted here to deter Karunatilaka and other corporate employees from engaging in insider trading. As a general matter, because insider trading schemes are both highly lucrative and difficult to detect, significant punishment is necessary to deter others from similar conduct. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence within the stipulated Guidelines sentencing range of 37-46 months is appropriate.

Dated:   New York, New York
             September 6, 2011

                                                Respectfully submitted,
                                                PREET BHARARA
                                                United States Attorney
                                                Southern District of New York


                                   By: _____
                                                Antonia Apps / David S. Leibowitz
                                                Assistant United States Attorneys